Filed 7/21/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS RENAN MANZANILLA,<br><br>    Defendant and Appellant. | B313557<br><br>(Los Angeles County<br>Super. Ct. No. MA063994)<br><br>ORDER MODIFYING OPINION<br><br>[No change in the judgment] |

IT IS ORDERED that the opinion filed in the above-captioned matter on June 13, 2022, be modified as follows:

1. On page 3, the last paragraph that begins with "After being represented" is deleted and replaced with: "After being represented by a different attorney at arraignment, Manzanilla was represented by a new public defender (counsel).  Counsel's defense file from 2014 has three entries for Manzanilla:  Her evaluation of his case on August 26, a meeting with him on August 27, and plea negotiations and a plea hearing on September 3."

2. On pages 4–7, 9–11, and 25, the words "Lin" and "Lin's" are deleted and replaced with "counsel" and "counsel's", respectively.

This modification effects no change in the judgment.

_____

STRATTON, P. J.          WILEY, J.          HARUTUNIAN, J.*

_____

*       Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/13/22; Certified for Publication 7/6/22 (order attached) (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS RENAN MANZANILLA,<br><br>    Defendant and Appellant. | B313557<br><br>(Los Angeles County<br>Super. Ct. No. MA063994) |

APPEAL from an order of the Superior Court of Los Angeles County. Daviann L. Mitchell, Judge. Reversed and remanded with instructions.

Immigrant Defenders Law Center, Caitlin E. Anderson and Hannah K. Comstock for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Carlos Renan Manzanilla moved to vacate a 2014 felony conviction under California Penal Code section 273.5,[1] which, with his sentence of 365 days' county jail, is an aggravated felony under immigration law and subjects him to mandatory deportation. Manzanilla claimed three legal errors: That defense counsel failed to advise him that his nolo contendere plea meant mandatory deportation; that defense counsel failed to defend against the immigration consequences of his charge by seeking an immigration-safe plea, such as a one-day reduction in his sentence; and that he did not understand that he faced mandatory deportation when he entered his plea.

The trial court denied Manzanilla's motion on all three claims of legal error. It also rejected the parties' agreement to allow Manzanilla to vacate his conviction and enter an immigration-safe plea to a misdemeanor. Manzanilla appealed.

We reverse on all grounds. Manzanilla's defense counsel did not specifically advise him that he would be subject to mandatory deportation. Defense counsel also failed to adequately defend because she did not consider the immigration consequences in plea bargaining, as evidenced by, among other things, her failure to counter the prosecution's initial offer of 365 days' jail with 364 days' jail, which would have prevented Manzanilla from having an aggravated felony conviction. Finally, there is contemporaneous, objective evidence that Manzanilla did not subjectively understand that his plea would subject him to mandatory deportation. Manzanilla has shown prejudice from these errors by a preponderance of the evidence,

---

[1] Undesignated statutory references are to the Penal Code.

including under the factors emphasized by our Supreme Court's recent decision in *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*).

We reverse and remand with instructions to grant the motion to vacate.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     2014 Felony Conviction**

On August 19, 2014, the People filled a felony complaint against Manzanilla, charging him with one count of injuring a cohabitant resulting in a traumatic condition under section 273.5, subdivision (a), for having injured his girlfriend, Kellie Warner.

According to the probation officer's report, while inebriated, Manzanilla became angry with Warner for allegedly driving his car without his consent. Manzanilla choked Warner, causing her to lose consciousness. When she woke up, Manzanilla hit her on her face and upper torso. Warner escaped and called the police. When the police arrived, they observed injuries on Warner. She was treated by paramedics at the scene after she refused to go to the hospital. Manzanilla was arrested.

In a subsequent interview with police, Warner said that during this incident, Manzanilla also pulled a knife on her, cut her forehead, threatened to kill her, and left her on the bathroom floor soaked in her own urine. Warner reported that Manzanilla had previously stabbed her, requiring surgery, and had been abusive "for a long time."

After being represented by a different attorney at arraignment, Manzanilla was represented by Deputy Public Defender Jodi Lin (Lin or counsel). Lin's defense file from 2014 has three entries for Manzanilla: Her evaluation of his case on August 26, a meeting with him on August 27, and plea negotiations and a plea hearing on September 3.

As the trial court summarized, Lin's pre-plea notes "had nothing to do with immigration." The August 26 entry reflects the section 273.5, subdivision (a) charge, possible unalleged charges, and ways to impeach Warner. The August 27 entry records Lin's first meeting with Manzanilla, where Lin explained her role, what Manzanilla should expect at the preliminary hearing, her defense plan, and possible unalleged charges. In her subsequent recollection of this meeting, Lin did not recall learning Manzanilla was a legal permanent resident nor discussing anything about the immigration consequences of his charge or potential charges.[2] Lin's third meeting with Manzanilla took place on September 3 at the preliminary hearing court's "lock up." This was the only day that Lin engaged in plea negotiations, and she does not remember raising Manzanilla's immigration status during them.

The People offered Manzanilla a plea to a felony section 273.5, subdivision (a) conviction with 365 days' jail, five years' probation, domestic violence classes, and a protective order. Manzanilla initially rejected this offer, telling Lin that he wanted less jail time and release on his own recognizance before sentencing. Lin countered with the same terms, except for requesting jail time of six and then nine months. The People denied both counteroffers. Manzanilla then accepted the initial offer of 365 days' jail, along with the other terms.

---

[2] Manzanilla's current counsel sent a questionnaire titled "Defense Counsel Questionnaire" to Lin, to which she responded on September 24, 2020 regarding her memory of the events in 2014.

4

Lin's notes from the September 3 plea negotiations reflect the prosecution's offer, her counteroffers and reasons for them, and then the prosecution's denial of those offers and Manzanilla's acceptance of the initial offer. Then the notes state that Lin advised Manzanilla on the criminal rights he was waiving by taking the plea and his acceptance of those waivers. Finally, Lin wrote: "Adv. Imm. Consequences. [Defendant] LPR. Adv. Plea will [change][3] his status. Advised [Defendant] he will have an immig. hrg." Lin's notes then say that Manzanilla "understands" and "says as long as hearing is in U.S., he's fine." Lin's subsequently memory is that she told him "there would be a hearing and he would lose his LPR status. Mr. Manzanilla said that as long as the hearing is in the U.S., he's fine. His focus at that hearing date was to get out of jail as quickly as possible." Lin later recalled that she learned Manzanilla was a legal permanent resident "when Mr. Manzanilla told me as we went over the immigration consequences. I documented that in his file." Manzanilla recalls Lin asking about his immigration status in the order reflected in her notes: After he told her he would take the plea offer.

During the plea colloquy on September 3, the preliminary hearing court asked Manzanilla whether he understood his rights and informed him of the consequences of his plea, but did not

---

[3]  Lin's handwritten notes have a triangle, rather than the word "change," which we read as the symbol for "change" given the context. In his opening brief, Manzanilla also read the triangle in this sentence as the symbol for "change" and the People did not object.

mention immigration consequences.  The court told Manzanilla that his plea was to a "felony conviction, which means you cannot own or possess a firearm for the remainder of your life.  If you violate probation, you're looking at up to four years in state prison."  The court informed Manzanilla that if he went to prison, then he could be on parole for up to three years.  It also advised Manzanilla that he might owe fines between $300 and $400, and that his plea was to a "priorable offense," so it could be used as an enhancement to any subsequent criminal convictions.  Manzanilla then waived his rights on the record.  In Manzanilla's Felony Advisement of Rights, Waiver, and Plea Form, he initialed next to the words, "Immigration Consequences – I understand that if I am not a citizen of the United States, I must expect my plea of guilty or no contest will result in my deportation . . . ."

The court ended the preliminary hearing by setting sentencing for September 24, 2017.

## II.    Initial Attempt to Revoke Plea in September 2014

Shortly after entering his plea on September 3, Manzanilla sent the court a letter requesting to retract his plea.  The letter is not in the record, but at the September 24, 2014 sentencing hearing the court stated that it had received Manzanilla's letter. The court said that it understood that Manzanilla wanted to withdraw his plea because he wanted a misdemeanor and he "wanted to withdraw his plea based on the fact that he might be deported."  Lin's notes from the hearing also state that Manzanilla "says in letter he wants to [withdraw] plea [because] this conviction will affect his LPR status [and] wants misd[emeanor.]"  Lin's notes further state that she had advised Manzanilla of the "imm[igration] conseq[uences] at the last court date and we had in depth discussion re:[Defendant's] LPR

6

status." Lin's notes say that she asked Manzanilla if the reason he knew about the immigration consequences of his plea was because she told him, and he nodded yes.

The sentencing court warned Manzanilla that if he were successful in withdrawing his plea, the prosecution "might take a more aggressive approach." The court also reminded Manzanilla that he signed a felony advisement form that informed him of the immigration consequences of his plea. The court then engaged in the following exchange with Manzanilla:

"Understanding all of that do you still wish to go forward with this deal?" Manzanilla replied, "Yes. Does that mean automatically I'm not a permanent resident anymore?" The court stated, "It means you will be deported, denied naturalization and excluded from admission. Yes." Manzanilla replied, "So I will be deported?" The court said, "Yes. So do you still want to move forward with the deal?" Manzanilla replied, "If I'm going to be deported, no." The court responded, "I want to know, do you want to go forward with the deal?" and Manzanilla said, "No." The court asked again, "And you want to withdraw it?" and Manzanilla said, "Yes." And the court then clarified, "Based on the immigration consequences?" to which Manzanilla replied, "Yes."

The court then turned to Lin and stated that Manzanilla's motion should "technically" be heard by the judge who took the plea a few weeks earlier. Lin responded that she was not the right person to handle the motion because she would "be testifying against myself." The court responded that Manzanilla was not claiming she was "negligent," but was just saying he did not like the plea. The court then denied the motion to withdraw the plea, finding that Manzanilla had "buyer's remorse."

7

It continued the sentencing hearing to October 8, 2014, at which time Manzanilla was sentenced to five years' probation and 365 days' jail.

## III.   May 2021 Motion to Vacate

On May 10, 2021, Manzanilla moved to vacate his 2014 felony conviction by filing a motion under section 1473.7. In support of his motion, he submitted a declaration signed under penalty of perjury, detailing, among other things, the following:

Manzanilla was born in Mexico in 1961.  He came to the United States when he was four years old as a legal permanent resident, also known as a green card holder.  Manzanilla has lived in the United States ever since.  He attended elementary and high school in Venice and college in Santa Monica. Manzanilla has two children who are United States citizens. His parents, who have passed away, and his siblings, all became or were born citizens.  Manzanilla started the process to become a citizen in the 1990s, but never finished.

In 2018, as a result of violating his parole due to financial barriers and a disability, Manzanilla spent three years in state prison.  He was then transferred directly from criminal custody to the custody of U.S. Immigration and Customs Enforcement in Bakersfield.  He remains there today while he waits for the Ninth Circuit Court of Appeals to resolve his immigration case.[4]

---

[4]     The Ninth Circuit heard oral argument in Manzanilla's immigration case in May 2021 and placed it in mediation pending final resolution of this postconviction motion to vacate.

8

Manzanilla was charged with deportation based on his conviction for an aggravated felony, specifically his September 2014 section 273.5, subdivision (a) conviction.

Manzanilla declares that he would not have taken the plea if he knew it would result in his deportation. He declares that his "whole life—my kids, my family—is here in the United States." He has no friends or family in Mexico. He is also afraid for his life if he returns to Mexico. He is bi-sexual, and last time he went to Mexico, in the 1990s, he was assaulted by the Mexican Federal Police based on his sexual orientation (as evidenced by derogatory language used during the assault) when they found him with a man, leaving him with broken ribs, a black eye, and other injuries.

Manzanilla also declares that when Lin went over the plea waiver form with him in 2014, he "was having a really hard time seeing because of my cataracts. I was taking a long time to read everything . . . she was standing over me and asking me to hurry up. She said it covered everything we had already talked about. I initialed and she walked away with the form."

In support of his motion, Manzanilla also included a declaration by his former girlfriend/the victim, Warner, (stating that she would have supported a plea that protected Manzanilla from deportation), transcripts from the September 24, 2014 hearing, Lin's case notes from 2014, Lin's questionnaire responses from September 2020, and records from Manzanilla's immigration case.

## V. Hearing and Ruling on Motion to Vacate

The trial court held a hearing on Manzanilla's motion to vacate on May 25, 2021. The People opened by reporting that the parties had reached an agreement for Manzanilla to vacate his

conviction and to plead to an immigration-safe misdemeanor. The trial court rejected the agreement, citing the facts in the probation report and stating that Manzanilla was not "a person that deserves a misdemeanor."

The trial court then denied Manzanilla's motion on all three claims of error. The court made its decision entirely on written documents. Manzanilla did not appear because he was in federal immigration detention.

First, the trial court found that defense counsel sufficiently advised Manzanilla when she told him that the "plea will change his status" and he would "have an immigration hearing," citing Lin's notes. The trial court subsequently characterized this advice as, "he was told he would be deported, and his whole point was as long as he had the hearing in the United States he was okay to go ahead and go forward. And that is what Ms. Lin's notes indicated . . . ." The trial court did not hear from Lin nor Manzanilla at the hearing, but it found Lin's credibility greater than Manzanilla's on the written record because he wanted out of his plea.

Second, the trial court found that defense counsel fulfilled her duty to defend against immigration consequences because defense counsel achieved a "good deal," citing defense counsel's characterization of the deal in her questionnaire and the allegations against Manzanilla in the probation report. The court also found that counsel "did her job" by countering the initial plea offer with six and then nine months of jail, rejecting Manzanilla's argument that all he needed was a more reasonable offer of a one-day reduction to 364 days to avoid an aggravated felony conviction.

Third, in rejecting Manzanilla's claim that he subjectively misunderstood that he would face mandatory deportation at the time of his plea, the trial court cited Lin's notes stating that she informed Manzanilla that his status would change and he would have an immigration hearing, concluding he "always understood he was going to be deported." Regarding the transcript from the September 2014 hearing when Manzanilla asked to withdraw his plea, the trial court viewed it not as reflecting Manzanilla finally understanding that he would be deported, as his counsel characterized it, but rather as him verifying what he already knew from Lin. The trial court then surmised that Manzanilla was not motivated by a fear of deportation, crediting the 2014 court's determination he had "buyer's remorse." The trial court cited Manzanilla's letter to the sentencing court from the days shortly after his plea, to which the trial court had access but Manzanilla's counsel did not (nor is it in the record on appeal), and stated that the letter showed that Manzanilla wanted to take back his plea because he was "pressured" by his public defender and that the letter did not mention his immigration concerns.

Finally, the trial court did not directly address prejudice to Manzanilla. It simply found that Manzanilla was not motivated by deportation in seeking to retract his plea in 2014, and that Lin was more credible than Manzanilla, as stated above.

Manzanilla timely appealed.

## DISCUSSION

### I. Standard of Review

Our Supreme Court recently determined the standard of review for section 1473.7 motion proceedings. In *Vivar*, the court endorsed the independent standard of review. (*Vivar*, *supra*, 11 Cal.5th at pp. 524–528.) Under independent review, we exercise

11

our independent judgment to determine whether the facts satisfy the rule of law. (*Id.* at p. 527.) When appellate courts engage in independent review, they should be mindful that independent review is not the equivalent of de novo review. (*Ibid.*) An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. (*Ibid.*) Factual determinations that are based on the credibility of witnesses the trial court heard and observed are entitled to particular deference, even though courts reviewing such claims generally may reach a different conclusion from the trial court on an independent examination of the evidence, even where the evidence is conflicting. (*Ibid.*) In section 1473.7 motion proceedings, appellate courts should similarly give particular deference to factual findings based on the trial court's personal observations of witnesses. (*Vivar*, *supra*, 11 Cal.5th at pp. 527–528.) Where, as here, the facts derive entirely from written declarations and other documents, there is no reason to conclude the trial court has special insight on the question at issue; as a practical matter, the trial court and appellate court are in the same position in interpreting written declarations when reviewing a cold record in a section 1473.7 proceeding. (*Vivar*, *supra*, 11 Cal.5th at p. 528.) Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7.

## II. Applicable Law

### A. Section 273.5 and Related Immigration Law

At the time of Manzanilla's plea, a section 273.5, subdivision (a) conviction, regardless of the sentence, qualified as a ground of deportability as a "crime of domestic violence." (8 U.S.C.§ 1227(a)(2)(E) [making crime of domestic violence

12

deportable]; *United States v. Laurico-Yeno* (9th Cir. 2010) 590
F.3d 818, 822 [section 273.5 is a domestic violence crime].)
A conviction under section 273.5 *with a sentence of 365 days or
longer*,[5] however, carries more significant immigration
consequences because the sentence of 365 days or more renders it
an "aggravated felony." (8 U.S.C. § 1227(a)(2)(A)(iii) & (a)(2)(E)(i)
[making a conviction for a "crime of violence" with a sentence of
one year or more an aggravated felony]; *Banuelos-Ayon v. Holder*
(9th Cir. 2010) 611 F.3d 1080, 1083 [holding section 273.5 is a
"crime of violence"].)

Mandatory removal from the United States is a
consequence of being convicted of a crime deemed an aggravated
felony under federal immigration law. (*Moncrieffe v. Holder*
(2013) 569 U.S. 184, 187–188 (*Moncrieffe*); 8 U.S.C. § 1228(c)
[aggravated felon is "conclusively presumed" deportable].)
An aggravated felony conviction further renders a defendant
ineligible for relief from deportation, such as asylum and
cancellation of removal. (*Moncrieffe*, *supra*, 569 U.S. at p. 187.)

**B. Section 1473.7**

Section 1473.7 authorizes a person who is no longer in
criminal custody to move to vacate a conviction or sentence where
the "conviction or sentence is legally invalid due to prejudicial
error damaging the moving party's ability to meaningfully
understand, defend against, or knowingly accept the actual or

---

[5] The section 273.5, subdivision (a) conviction did not require
a sentence of a year or more. The charge range, as listed in the
felony complaint, was zero to 365 days' county jail or two to four
years in state prison.

potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) "Under this new provision, a court 'shall' vacate a conviction or sentence upon a showing, by a preponderance of the evidence, of 'prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere.' [Citation.]" (*Vivar*, *supra*, 11 Cal.5th at p. 523.)

Effective January 1, 2019, the Legislature amended section 1473.7 to clarify that a "finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).) Therefore, a defendant asserting error need not prove the elements of a claim for ineffective assistance of counsel but may instead show prejudicial error. (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1008–1009 (*Camacho*).) To establish prejudice, a defendant must show by a preponderance of the evidence that he would not have entered the plea had he known about the immigration consequences. (*Id.* at pp. 1010–1011; *see People v. Martinez* (2013) 57 Cal.4th 555, 565 [defendant may show prejudice by "convinc[ing] the court [that he] would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow"]; *see Lee v. U.S.* (2017) __ U.S. __ [137 S.Ct. 1958, 1965] [a defendant can show prejudice by demonstrating a reasonable probability he would not have pled guilty and would have insisted on going to trial, but for counsel's errors].)

III.  **Manzanilla Demonstrated Error Under Section 1473.7, subdivision (a)(1)**

Manzanilla claims prejudicial error based on all three possible errors enumerated in section 1473.7, subdivision (a)(1):

His " 'ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere.'  (§ 1473.7, subds. (e)(1), (a)(1).)."  (*Vivar*, *supra*, 11 Cal.5th at p. 523.)

## A.  Counsel Did Not Specifically Advise Manzanilla That He Faced Near Certain Deportation

Manzanilla claims that his motion to vacate should be granted because defense counsel failed to inform him that his plea would subject him to mandatory deportation.  We agree that counsel's advice was inadequate under applicable law.

Since the Supreme Court's decision in *Padilla v. Kentucky* (2010) 559 U.S. 356 (*Padilla*), defense counsel has had a duty to properly explain the adverse immigration consequences of a plea to a defendant.[6]  The court observed that the right to remain in the United States can be more important to a defendant than any potential jail sentence.  (*Id.* at p. 368.)  Where immigration law is " 'succinct, clear, and explicit' that the conviction renders removal virtually certain, counsel must advise his client that removal is a virtual certainty."  (*United States v. Rodriguez-Vega* (9th Cir. 2015) 797 F.3d 781, 786 (*Rodriguez-Vega*), citing *Padilla*, *supra*, 559 U.S. at p. 369.)  Immigration law is clear that removal is

---

[6]    California later codified this principal, effective in 2016, in section 1016.3: "(a) Defense counsel shall provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences." (§ 1016.3, subdivision (a).)

15

"virtually certain" when "the immigration statute or controlling case law expressly identifies the crime of conviction as a ground for removal," which is the case here.[7] (*Rodriguez-Vega, supra,* 797 F.3d at p. 786.)

Defense counsel's contemporaneous notes reflect that she told Manzanilla that his plea would "[change] his status [and] he [would] have [an] immigration hearing."[8] This is the kind of description one would give if they wanted to avoid actually stating that deportation would ensue. Counsel did not explain that Manzanilla faced mandatory deportation. Counsel's advice was deficient for lack of specificity despite clear law establishing that Manzanilla's removal was virtually certain. (See *Padilla, supra,* 559 U.S. at p. 369; Cf. *People v. Lopez* (2021) 66 Cal.App.5th 561, 579–580 (*Lopez*) [counsel's failure to explain the difference between an "aggravated felony which meant virtually certain deportation and a nonaggravated felony which left open the possibility for relief" was inadequate advice]; accord *People v. Espinoza* (2018) 27 Cal.App.5th 908, 916 [where defendant was advised that he could be deported but not told deportation would

---

[7]    As detailed above, the law was clear that a conviction under section 273.5, subdivision (a) with a 365-day or longer sentence was an aggravated felony and made Manzanilla subject to mandatory deportation and ineligible for asylum and other forms of relief. The People do not dispute this.

[8]    Defense counsel's later memory is of telling Manzanilla he would "lose his LPR status," not only that his status would "change."

be mandatory, advice constituted ineffective assistance of counsel].) "To warn merely ' "that his plea might have immigration consequences," ' in circumstances where the consequences were 'certain,' was 'constitutionally deficient.' " (*Vivar*, *supra*, 11 Cal.5th at p. 521.)

That Manzanilla initialed the felony advisement, or *Tahl* form as it is generally known,[9] did not absolve defense counsel of the duty to advise of immigration consequences. Even where the form says that the defendant "will" be deported, it does not substitute for the advice of counsel, and it is not a categorical bar to relief. " 'Although the *Tahl* form contains the word "will" and not "may," it, standing alone, is akin to the "generic advisement" required of the court under Penal Code section 1016.5 . . . and it similarly "is not designed, nor does it operate, as a substitute for such advice" of defense counsel regarding the applicable immigration consequences in a given case.' [Citation.]" (*Lopez*, *supra*, 66 Cal.App.5th at p. 577.)

The only warning Manzanilla received that his plea would result in deportation was the *Tahl* form. Manzanilla initialed the *Tahl* form, but he said shortly afterwards that he felt pressured to sign it by counsel who told him to hurry up. He further declared that he had difficultly reading it because of his cataracts, and counsel said it covered everything they had discussed, so he simply initialed. Regardless, in evaluating the *Tahl* form's language, " ' " '[t]he defendant can be expected to rely

---

[9]     See *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*), overruled on other grounds by *Mills v. Municipal Court* (1973) 10 Cal.3d 288, 291.

on counsel's independent evaluation of the charges' " ' " rather than the generic statements in the *Tahl* waiver and plea colloquy. (*Lopez, supra*, 66 Cal.App.5th at p. 577, quoting *People v. Patterson* (2017) 2 Cal.5th 885, 896.) Even if counsel went over the *Tahl* form in detail and Manzanilla read every word in it, there is no evidence that defense counsel fulfilled her duty to give him *specific* advice that he would be subject to mandatory deportation as a result of pleading no contest.

The circumstances in *People v. Tapia* (2018) 26 Cal.App.5th 942 (*Tapia*), cited by the People, are materially different. In *Tapia*, the "only evidence" that the defendant was not properly advised by counsel was the defendant's own declaration, which the trial court found not credible because the record showed defense counsel requested more time to determine the immigration consequences of the plea. (*Id.* at p. 953.) Here, counsel's own notes and later memory state that she merely told Manzanilla his status would change or he would "lose his LPR status," and he would have an immigration hearing in the United States—not that he would be deported.

Accordingly, the record fails to support the conclusion that defense counsel advised Manzanilla that his plea would subject him to mandatory deportation.

**B. Counsel Did Not Defend Against Deportation**

Manzanilla next asserts that counsel failed to adequately defend against the immigration consequences of his plea. We agree.

In *Padilla*, the Supreme Court described counsel's duty to "plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce[s] the likelihood of deportation, as by avoiding a conviction for an offense that

18

automatically triggers the removal consequence." (*Padilla*, *supra*, 559 U.S. at p. 373.)[10]

There are many ways to do this. Well before *Padilla*, the Court of Appeal, Sixth District, identified common ways that defense counsel can bargain to avoid a conviction that automatically triggers deportation, one of which is to negotiate a sentence of 364 days instead of 365 days for offenses that become aggravated felonies at 365 days. (*People v. Bautista* (2004) 115 Cal.App.4th 229, 240, fn. 8 (*Bautista*).)

Defense counsel's notes and actions show that she failed to bargain creatively with the prosecutor to reduce the likelihood of automatic deportation. (See *Padilla*, *supra*, 559 U.S. at p. 373.) It is undisputed that counsel failed to make a counteroffer of 364 days in custody, which was more likely to be accepted by the prosecution than the more significant sentence reductions she sought of six or nine months. (See *Lopez*, *supra*, 66 Cal.App.5th at p. 580 [counsel "could have sought a plea agreement that was more likely to be accepted . . . yet avoided the worst of the adverse immigration consequences"].) Simply requesting jail terms of six and nine months was insufficient. For example, in *Bautista*, the court found a failure to defend despite counsel's attempt to quash a warrant, which, if successful, would have prevented deportation. (*Bautista*, *supra*, 115 Cal App.4th at

---

[10] California subsequently codified this in 2015, effective 2016, by adding a specific duty to "defend against [adverse immigration] consequences" to the Penal Code. (§ 1016.3, subd. (a).) This new statue was explicitly intended by the "Legislature to codify *Padilla v. Kentucky* and related California case law . . . ." (§ 1016.2, subd. (h).)

pp. 237–242.)  This was also the case in *Lopez*, where the court found a failure to defend despite counsel's "attempt to negotiate [an immigration-neutral] simple possession plea."  (*Lopez*, *supra*, 66 Cal.App.5th at p. 579.)

The People point out that in counsel's questionnaire, she recalled asking for the six- and nine-month terms because she says she knew that a conviction of one year meant an "aggravated felony" and "he would be deported."  But counsel's contemporaneous notes are silent as to the immigration consequences of her counteroffers.  Instead, they state that they were dictated by Manzanilla's uninformed (as to the immigration consequences) interest in obtaining a misdemeanor and a shorter sentence, rather than counsel's efforts to mitigate immigration consequences.  Regardless, as in *Bautista* and *Lopez*, these counteroffers do not absolve her of her failure to defend.

Moreover, counsel does not remember raising Manzanilla's immigration status in plea bargaining, and her notes confirm this.  Her notes and memory also confirm that she learned Manzanilla was a legal permanent resident only when they discussed the consequences of the plea, after he stated he would take it, and after her counteroffers.  This suggests that counsel failed to bargain creatively with the prosecution in a manner that considered immigration consequences.  (See *Padilla*, *supra*, 559 U.S. at p. 373.)[11]

---

[11]    Manzanilla also argues that defense counsel could have bargained for a false imprisonment charge.  We need not address this argument as we find that counsel failed to discharge her

The People counter that Manzanilla has not presented any "affirmative evidence" that the prosecution would have accepted an immigration-safe plea. This is not required to establish legal error; it goes to prejudice. Regardless, evidence that the prosecution *would* have accepted a 364-day plea is not required even for prejudice. In the cases the People cite, there was no indication that an immigration-safe plea was available that would have been reasonable to the prosecution. (See, e.g., *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1074 ["Nor is there any indication whatsoever that such a suggestion would have been acceptable in negotiations with the People or when presented to the trial court"]; *People v. Olvera* (2018) 24 Cal.App.5th 1112, 1118 [defendant "does not identify any immigration-neutral disposition to which the prosecutor was reasonably likely to agree"]; *People v. Perez* (2018) 19 Cal.App.5th 818, 830 ["There is no indication in the record that the prosecution was willing to agree to an immigration safe disposition"].) Here, there is an indication the prosecution would reasonably accept a plea of 364 days because the prosecution's opening offer was 365 days. The People offer no explanation as to why the prosecution would have not found a one-day reduction reasonable.[12]

_____

duty based upon the failure to request a one-day sentence reduction.

[12]    The People's argument is particularly puzzling in light of their ultimate agreement (rejected by the trial court) in 2021 to allow Manzanilla to withdraw his plea and plead to an immigration-safe misdemeanor.

21

Relying on *Bautista*, the People nonetheless suggest that some higher evidentiary standard is required than what is present here. In *Bautista*, the defendant offered a declaration from his defense counsel admitting that he sought a lenient sentence and not an immigration-neutral charge, and a declaration from a law professor stating that the prosecution would have likely accepted an immigration-safe charge. (*Bautista, supra*, 37 Cal.App.4th at pp. 238–240.) But here there is even stronger evidence in the form of the prosecution's actual opening offer of just *one* additional day in jail than Manzanilla needed to prevent the conviction from being an aggravated felony. There is certainly nothing in the record indicating an effort to reduce the sentence by one day would have been doomed to failure. And, as Manzanilla suggests, that time could have been made up in a reduction in time served (such as a waiver of section 4019 credits) or other creative bargaining techniques.

Moreover, requiring an admission from defense counsel or expert testimony, as existed in *Bautista*, would impose a condition on obtaining relief under section 1473.7 that is not contained in the statute. The court can certainly consider what evidence is or is not in the record, but there is no litmus test requiring that the original defense counsel agrees they failed to adequately negotiate on behalf of their client.

In sum, we find a failure to adequately defend against Manzanilla's deportation in plea bargaining by defense counsel.

### C. Manzanilla Did Not Subjectively Understand That His Plea Made Him Subject to Deportation

In his final claim of error, Manzanilla asserts that he did not subjectively understand that his plea exposed him to mandatory deportation. Objective record evidence supports this contention.

The focus of our inquiry "is on the '*defendant's own error* in . . . not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States.' " (*People v. Mejia* (2019) 36 Cal.App.5th 859, 871 (*Mejia*), italics in original, citing *Camacho, supra*, 32 Cal.App.5th at p. 1009.) The defendant must show that "he did not 'meaningfully understand' or "knowingly accept" the mandatory deportation consequences when he pleaded guilty in 2014. [Citation.]" (*Mejia, supra*, 36 Cal.App.5th at p. 872.)

Objective evidence contemporaneous with Manzanilla's plea shows he did not meaningfully understand its consequences. According to counsel's notes, she did not warn Manzanilla that he would be deported, but only said that his status would change, and he would have an immigration hearing. Manzanilla then responded that if the hearing was in the United States, then it was "fine." This statement suggests subjective misunderstanding. If Manzanilla knew he was subject to mandatory deportation to Mexico, then his concern about the location of his immigration hearing seems irrelevant.

The transcript of the sentencing hearing just 21 days after his plea also shows that Manzanilla did not understand his plea meant mandatory deportation. In fact, it confirms that he only thought, as counsel advised, that his immigration status would change. After the judge asked, "do you still wish to go forward

with this deal?" he replied "Yes. Does that mean automatically I'm not a permanent resident anymore?" The court elaborated: "It means you will be deported." Manzanilla then asked, "So I will be deported?" The court confirmed this, and Manzanilla said, "If I'm going to be deported, no" he did not want the deal.

The trial court erred in rejecting this evidence and concluding, "[h]e always understood he was going to be deported," citing counsel's notes. Counsel's notes do not mention deportation. Moreover, they are irrelevant to Manzanilla's subjective understanding. "[W]hat the defense attorney said or did not say about the immigration consequences of the plea" does not govern the inquiry into subjective misunderstanding. (*People v. Jung* (2020) 59 Cal.App.5th 842, 857 (*Jung*), disapproved of on other grounds in *Vivar, supra,* 11 Cal.5th at p. 526, fn. 4; accord *Mejia, supra,* 36 Cal.App.5th at p. 866.)

The People claim that Manzanilla's signature and initials on the *Tahl* form show he subjectively understood he would be deported. This argument has been rejected by numerous courts where there is contemporaneous evidence to the contrary, and we reject it today. (See, e.g., *Jung, supra,* 59 Cal.App.5th at pp. 847, 857–858; *Mejia, supra,* 36 Cal.App.5th at pp. 865, 872–873.) The People cite no authority for their claim that this is sufficient when there is contemporaneous evidence to the contrary.

The People also argue that we should give deference to the 2014 sentencing court that addressed Manzanilla's letter and request to withdraw his plea because that court witnessed Manzanilla testify and determined he had "buyers remorse." We disagree. Factual determinations based on credibility are entitled to deference when they have record support. (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 79 ["If the trial court had

24

heard live testimony, instead of reading written declarations, its credibility determinations would be entitled to deference if supported by the record"].)  The 2014 sentencing court did not have a section 1473.7 motion before it, let alone any evidence in support of the motion going to subjective misunderstanding.  For example, it did not have Lin's notes showing that her advisal was only that Manzanilla's status would change and he would have an immigration hearing, which Manzanilla found acceptable if the hearing was in the U.S, a bizarre concern if he meaningfully understood he would be deported.

The sentencing judge also curtailed any arguments by Manzanilla that he did not understand he would be deported at the time of his plea.  It rejected counsel's suggestion that she should conflict off the motion, and ended the hearing without further testimony from Manzanilla after he requested to take back his plea based on the immigration consequences.

Finally, the People are not asking us to review the trial court's factual finding based on credibility, but the 2014 sentencing court's conclusion.  Even so, appellate courts reviewing factual determinations based on the credibility of witnesses that a trial court observed may reach a different conclusion on an independent examination of the evidence. (*Vivar*, *supra*, 11 Cal.5th at pp. 527–528.)

The swiftness with which Manzanilla brought his concern about deportation to the attention of the trial court after entry of the plea supports our conclusion that he did not meaningfully understand the immigration consequences of the plea.  He did not wait months or years to claim he did not realize he would be deported.  He did not wait to claim he did not understand the consequences only after efforts to avoid deportation proceedings

had failed.  He was not making a desperate allegation to avoid the consequences of an immigration proceeding that had gone unexpectedly bad.  Manzanilla advised the court at the first court hearing after entry of the plea, 21 days later, with no deportation proceeding underway, that he had not understood that deportation was a certainty.

Objective, contemporaneous evidence establishes Manzanilla did not subjectively understand he would be deported when he entered his plea.

## IV.    Manzanilla Demonstrated Prejudicial Error

"[P]rejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar*, *supra*, 11 Cal.5th at p. 529.)  "When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances.  [Citation.]  Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Id.* at pp. 529–530.)

Manzanilla has established prejudice under all four factors that *Vivar* identified as particularly relevant.  First, at the time of his plea, Manzanilla had been in the United States since 1965, when he arrived as a four-year-old child, so had called the United States home for approximately 55 years.  He went to school and started a family in California, and his family members, including his U.S. citizen minor children, are in the United States.

26

In contrast, he has no family ties to Mexico, and the last time he was there, on vacation with his family in the 1990s, he was assaulted due to his sexual orientation and never returned. This evidence "constitute[s] contemporaneous objective facts that corroborate [the defendant's] concern about the immigration consequences of his plea options." (*Vivar*, *supra*, 11 Cal.5th at p. 530.)

Second, the facts near the time of Manzanilla's plea show that he would not have pled guilty had he known he would be deported. In his sentencing hearing just 21 days after his plea, he asked to take back his plea when he was told it meant not only that he would lose his legal permanent resident status, but that he would be deported. (Cf. *Vivar*, *supra*, 11 Cal.5th at p. 531 [finding contemporaneous evidence of prejudice where defendant wrote court three months after his plea saying he would not have taken it if he knew he would be deported].) According to counsel's notes from the hearing, he said that he wanted to withdraw his plea because "this conviction will affect his [legal permanent resident] status." In addition, Manzanilla's response to counsel that the plea was acceptable if the immigration hearing was in the United States is contemporaneous evidence that he was concerned with his physical location and would not have wanted to be deported to Mexico.

Third, a defendant's stated interests during plea negotiations are relevant to the prejudice inquiry if they were based on a full and accurate understanding of the immigration consequences at issue. (*Vivar*, *supra*, 11 Cal.5th at p. 532.) A defendant's stated interests during plea bargaining "can hardly serve as evidence that he didn't care about immigration consequences when it is undisputed that [he] was not properly

27

advised—and thus was ignorant—of the immigration consequences attached to his various plea options." (*Ibid.*) In *Vivar*, the defendant even rejected—unknowingly—an immigration neutral plea offered by the prosecution, and the court found prejudice: "[T]hat he *unknowingly* rejected an immigration-neutral option cannot, in itself, demonstrate that 'immigration consequences were not defendant's primary consideration.'" (*Ibid.*) The objective evidence of Manzanilla's goals during plea bargaining, according to counsel's notes, are that he wanted a misdemeanor, minimal jail time, and his immigration hearing in the United States. Because counsel never told Manzanilla his plea would result in mandatory deportation, his uninformed interests during plea negotiations do not show that he was indifferent to immigration consequences.

Fourth, Manzanilla had reason to believe an immigration-neutral disposition was possible, because all he needed was a one-day reduction in jail time. A defendant need not have a subjective understanding that the disposition is possible, as evidenced by *Vivar* where the defendant rejected an immigration safe plea in favor of one that subjected him to deportation because counsel failed to advise him adequately. (*Vivar*, *supra*, 11 Cal.5th at p. 532.)

Manzanilla has established a reasonable probability that he would have rejected the plea if he had correctly understood its actual or potential immigration consequences of deportation; indeed, he tried to take back the plea just 21 days later.

28

## DISPOSITION

We reverse the order denying Manzanilla's motion to vacate his conviction.  On remand the trial court should grant the motion, vacate Manzanilla's 2014 conviction, and set the matter for further proceedings.


HARUTUNIAN, J.[*]

We concur:


STRATTON, P. J.


WILEY, J.

---

[*]     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/6/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS RENAN MANZANILLA,<br><br>        Defendant and Appellant. | B313557<br><br>(Los Angeles County<br>Super. Ct. No. MA063994)<br><br>ORDER CERTIFYING<br>PUBLICATION<br><br>[No change in the judgment] |

THE COURT:

        The opinion in the above entitled matter was filed on June 13, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

STRATTON, P. J.        WILEY, J.        HARUTUNIAN, J.[*]

_____

[*]        Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.